UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NARCISCO FRANCO, | ) | |
| Petitioner | ) | |
| | ) | Civil Action No. 05-10862-MEL |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Respondent | ) | |
| | ) | |

**Government's Memorandum in Opposition To
Petitioner's Motion Under 28 U.S.C. § 2255**

<u>Introduction</u>

The United States of America, by Michael J. Sullivan, United States Attorney, and

Michael J. Pelgro, Assistant U.S. Attorney, hereby files this memorandum in opposition to the

petitioner's motion under 28 U.S.C. § 2255. As set forth more fully below, the petitioner's

motion should be denied without an evidentiary hearing because the petitioner's allegations that

his former attorney was constitutionally ineffective at sentencing by failing to request an

evidentiary hearing on the "safety-valve" issue and by failing to request a downward departure

based on alleged extraordinary family circumstances are refuted by the record in the criminal

case. Moreover, the petitioner's claim that the Court erred by failing to conduct an evidentiary

hearing on the "safety-valve" issue was summarily rejected by the Court of Appeals in the

petitioner's direct appeal and cannot be relitigated in this forum. Finally, the petitioner's claim

of vindictiveness by the government at sentencing is not supported by any facts at all and is

refuted by the record in the criminal case. Accordingly, the Court should dismiss the petitioner's

motion.

## Relevant Facts And Procedural Background[1]

The offenses and the indictment

On July 12, 2001, Franco was arrested, along with co-defendant Javier Santiagofiol, whose true name was Martin Pena ("Pena"), when they attempted to distribute thirteen ounces of cocaine to a cooperating witness ("CW") who was working with the Drug Enforcement Administration ("DEA") after the CW had been arrested by DEA a short time earlier. [CC ¶ 18; PSR ¶¶ 2-3]. Earlier that day, the CW reported to DEA that Pena and Franco had provided the CW with nine ounces of cocaine. [PSR ¶ 5]. After his arrest, the CW arranged a meeting with Pena and Franco under the pretext that the CW wanted to deliver a portion of $10,000 to the two men from the previous sale and to collect more cocaine from them to complete a pending deal that the CW had with a customer. [CC ¶ 16; PSR ¶¶ 4-5]. A car being driven by Franco and containing Pena as a passenger was stopped by law enforcement agents, who recovered the 13 ounces of cocaine. [PSR ¶¶ 7-9].

On July 13, 2001, Attorney James McCall was retained by Franco and filed his notice of appearance with the Court. [DE 4]. On August 24, 2001, Franco was released on conditions by U.S. Magistrate Judge Robert B. Collings. On September 19, 2001, Franco and Pena were charged in a two-count indictment with conspiracy to distribute at least 500 grams of cocaine, in violation of 21 U.S.C. § 846, and with distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1). [DE 16]. Count One contained a notice provision that the five-year mandatory

---

[1]The facts and procedural history set forth herein are taken from the docket entries ("DE"), the Presentence Report ("PSR"), the Criminal Complaint ("CC"), the Rule 11 Hearing Transcript ("Rule 11 Tr."), the Defendant's Sentencing Memorandum ("DSM"), and the Sentencing Hearing Transcript ("ST") in the underlying criminal case, Criminal No. 01-10333-MEL.

minimum sentence set forth in 21 U.S.C. § 841(b)(1)(B) applied.

Franco's Default

On February 28, 2002, Franco failed to appear in court for his scheduled Rule 11 hearing. [PSR ¶ J].  After receiving information from the Pretrial Services Department that Franco had absconded, the Court issued an arrest warrant on March 1, 2002.  [PSR ¶ K].  Over two months later, on May 17, 2002, Franco was arrested in Worcester by the U.S. Marshals Service.[2]  [PSR ¶ L].  Franco was detained after this arrest.  [PSR ¶ L].

Franco's plea agreement and guilty plea

On July 25, 2002, Franco pleaded guilty to both counts of the indictment pursuant to a written plea agreement with the government.[3]  In the agreement, the parties agreed to take the position at sentencing that Franco was responsible for 500 - 2000 grams of cocaine[4] and that he should receive a two-level obstruction-of-justice enhancement under U.S.S.G § 3C1.1 for failing to appear at his Rule 11 hearing.  Franco reserved the right to request a three-level acceptance-of-responsibility reduction while the government stated that it would oppose the request.  *See* U.S.S.G. § 3E1.1, comment. (n. 4)(stating that a defendant who receives an obstruction-of-justice enhancement should not receive an acceptance-of-responsibility reduction except in an "extraordinary" case).  In the agreement, Franco explicitly acknowledged that he was "satisfied" with his legal representation.

---

[2]Franco was living at various addresses in Boston when he was arrested by DEA in July 2001.  [PSR ¶¶ 53-55].

[3]A copy of the signed plea agreement was attached to the PSR in the criminal case.

[4]This quantity set Franco's Base Offense Level ("BOL") at 26 and made Franco subject to the five-year minimum mandatory sentence set forth in 21 U.S.C. § 841(b)(1)(B).

At the Rule 11 hearing, Franco stated under oath that he was aware of the nature of the charges, that he was aware of this constitutional rights, and that he was pleading guilty knowingly, freely, and voluntarily.  [Rule 11 Tr. 5-10].   In response to specific questions from the Court, Attorney McCall stated that he had represented Franco since July 2001 and that he had gone over the case with Franco during Franco's "many visits" to his office.  [Rule 11 Tr. 3].

Franco's Presentence Report

In the PSR, the Probation Department determined that Franco was responsible for the thirteen ounces of cocaine seized on July 12, 2001, as well as the nine ounces of cocaine Franco and Pena had sold to the CW earlier that same day, which yielded a BOL of 26. [PSR, ¶ 22]. Based on a two-level increase for obstruction of justice, stemming from Franco's failure to appear for a scheduled Rule 11 hearing, and no reduction for acceptance of responsibility, the Probation Department determined that Franco's Total Offense Level ("TOL") was 28. [PSR ¶¶ 26-29].  Since Franco fell within Criminal History Category ("CHC") I, [PSR ¶¶ 31-34], his Guideline Sentencing Range ("GSR") was 78 - 97 months.  [PSR, ¶ 75].

The Probation Department observed that Franco met the first four criteria of the "safety valve" provision, U.S.S.G. § 5C1.2, but that a determination had to be made whether he met the fifth criterion (i.e., whether he provided truthful and complete information to the government). [PSR ¶ 30].  In its objections, the government indicated that Franco did not qualify for the "safety valve" provision based on what it considered to be the truthful "safety valve" proffer of Pena that he and another person were selling cocaine for Franco and that Franco had "orchestrated" the distributions of cocaine to the CW in July 2001.  [PSR ¶¶ 9A-9F; Addendum to PSR, Gov. Obj. No. 1].

4

Attorney McCall filed four written objections to the PSR on Franco's behalf.  While

McCall conceded that Franco should be assessed a two-level obstruction enhancement, he

maintained that Franco should also receive a three-level reduction for acceptance of

responsibility because of his "extraordinary" circumstances.  [Addendum to PSR, Def. Obj.

No.1].  McCall also corrected certain factual information in the PSR, [Addendum to PSR, Def.

Obj. Nos. 2 and 3].  Lastly, McCall took issue with the government's above objection indicating

that Franco perhaps should receive a role enhancement and emphasized that Franco and Pena

were actually joint venturers and co-conspirators who acted in tandem in the offense conduct.

In December 2002, McCall filed a sentencing memorandum seeking a five-level

reduction in Franco's offense level, resulting in a TOL of 23 and a GSR of 46 to 57 months.

[DE 90].  In his memorandum, McCall argued that, notwithstanding his obstruction of justice,

Franco deserved a three-level reduction for acceptance of responsibility since his flight was

"impulsive" and "the result of immense personal pressure brought to bear by his pregnant

girlfriend." [DSM 1-2].  McCall also asserted that Franco qualified under the "safety valve"

provision because he had given a truthful and complete proffer to the government, thus resulting

in an additional two-level reduction under U.S.S.G.

§ 2D1.1(b)(7).  [DSM 3-4].[5]

Franco's Sentencing Hearing

On December 4, 2002, the Court conducted Franco's sentencing hearing.  At the hearing,

McCall argued strenuously that Franco had given a truthful and complete proffer to the

---

[5]McCall also emphasized his assertion that Franco should not get any role-in-the-offense
enhancement.  [DSM 2-3].  The Probation Department agreed with McCall on this issue and had
not enhanced Franco's offense level based on his role in the conspiracy.

government and thus qualified for the "safety valve" reduction, that Franco should not be given a role-in-the-offense enhancement, and that Franco should be given an acceptance-of-responsibility reduction. [ST 3-6]. The government argued that, based on the totality of the facts set forth in the PSR, including Pena's proffer, Franco had not been truthful and that he should not receive a "safety valve" reduction. [ST 7-9]. The government also asserted that Franco should not get an acceptance-of-responsibility reduction and that he should get a three-level role enhancement. [ST 6-7, 9]. The government recommended a sentence of 95 months' imprisonment. [ST 9].

Franco exercised his right of allocution, apologizing for his criminal conduct. [ST 10-11]. Franco mentioned the reason for his failure to appear at his Rule 11 hearing and the hardship that his incarceration would cause to his three minor children. [ST 10-11]. However, he failed to say anything about his "safety valve" proffer; he never requested an evidentiary hearing on this issue; and he voiced no dissatisfaction with Attorney McCall.

The Court adopted the Probation Department's calculations, concluding that the appropriate BOL was 26 with a two-level increase for obstruction of justice, resulting in a TOL of 28. [ST 11-12]. The Court did not grant Franco a reduction for acceptance of responsibility because of his "deliberate, although understandable, failure to appear in court as required," further observing that Franco had cut off his electronic monitoring bracelet and then had traveled to New York. [ST 12]. The Court agreed with McCall that Franco did not deserve a role enhancement, but also agreed with the government that he did not qualify for a "safety valve" reduction because he had not given a truthful proffer. [ST 11-12, 15-16]. The Court imposed a low-end sentence of 78 months' imprisonment. [ST 13].

6

<u>Franco's Direct Appeal</u>

Franco filed a direct appeal on December 16, 2002. [DE 96]. In the appeal, in which he was represented by a different attorney, Franco argued, *inter alia,* that the Court erred in adopting the PSR in lieu of making specific findings and in failing to conduct an evidentiary hearing on the disputed issue of Franco's eligibility for the "safety valve" reduction. Franco asserted that his sentence should be vacated and that the case should be remanded for an evidentiary sentencing hearing on the "safety valve" issue.

On November 24, 2004, the Court of Appeals summarily affirmed this Court's judgment and mandate was entered on December 20, 2004. [DE 120]. The Court of Appeals opined that Franco did not qualify for the "safety valve" reduction because "while a defendant does not merit the technical designation of a leader/organizer under the definition of safety valve criterion four, he has nonetheless failed to be completely candid in his criterion five proffer by underplaying, or minimizing, his actions within the role in which he did engage."

**Argument**

I.    **The Court Should Deny Franco's Petition Without Conducting an Evidentiary Hearing.**

Franco bears the burden of demonstrating, by a preponderance of evidence, not only that he

is entitled to relief under 28 U.S.C. §2255, but also that he is entitled to an evidentiary hearing. <u>Barrett v. United States</u>, 965 F.2d 1184, 1186 (1st Cir. 1992); <u>United States v. McGill</u>, 11 F.3d 223, 225 (1st Cir. 1993); <u>Cody v. United States</u>, 249 F.3d 47, 54 (1st Cir. 2001). An evidentiary hearing is unnecessary when a §2255 petition "is inadequate on its face" or, "although facially adequate [,] is conclusively refuted as to the alleged facts by the files and records of the case."

7

McGill, 11 F.3d at 226. *See also* Lema v. United States, 987 F.2d 48, 51 (1ˢᵗ Cir. 1993) (accord);

Barrett, 965 F.2d at 1186 (accord). A petitioner is not entitled to an evidentiary hearing where

his allegations "cannot be accepted as true because 'they are contradicted by the record,

inherently incredible, or conclusions rather than statements of fact.'" Murchu v. United States,

926 F.2d 50, 57 (1ˢᵗ Cir. 1991) (citation omitted); McGill, 11 F.3d at 226 (accord), or where they

"amount to mere 'bald' assertions without sufficiently particular and supportive allegations of

fact," Barrett, 965 F.2d at 1186.

> A district court may dismiss a section of 2255 petition without
> holding an evidentiary hearing if it plainly appears on the face
> of the pleadings that the petitioner is not entitled to the requested
> relief, or if the allegations, although adequate on their face, consist
> of no more than conclusory prognostications and perfervid rhetoric,
> or if the key factual averments on which the petition depends are
> either inherently improbable or contradicted by established facts of
> record.

United States v. LaBonte, 70 F.3d 1396, 1412-13 (1ˢᵗ Cir. 1995). The trial judge, moreover, "is

at liberty to employ the knowledge gleaned during previous proceedings and make findings based

thereon without convening an additional hearing." McGill, 11 F.3d at 225. *See also* Cohen v.

United States, 1997 WL 305222 at *2 (D. Mass. 1997) (Young, CJ) (accord); Indelicato v.

United States, 106 F. Supp. 2d 151, 154 (D. Mass. 2000) (Saris, J) (accord).

In this case, no evidentiary hearing is required. Franco's conclusory claim of ineffective

assistance is conclusively refuted by the record in the criminal case, which clearly demonstrates that

Attorney McCall was not constitutionally ineffective in his representation of Franco at the

sentencing hearing. Moreover, Franco's contention that this Court committed error in failing to

conduct an evidentiary hearing was resolved against him in his direct appeal and his claim of

prosecutorial vindictiveness is completely devoid of factual support.

**II.    Franco's Claim That Attorney McCall Was Ineffective At Sentencing Is Not Supported By the Record.**

<u>Legal Standard</u>

Under the well-known test enunciated by the Supreme Court in <u>Strickland v.Washington</u>, 466 U.S. 668 (1984), in order to prevail, Franco must establish (1) that "counsel's performance was deficient....that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) "that the deficient performance prejudiced the defense...that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u> at 687. *See also* <u>Bucuvalas v. United States</u>, 98 F.3d 652, 658 (1st Cir. 1996) (observing that a defendant's burden of proving both prongs of the <u>Strickland</u> test is "heavy").

Under the first prong, Franco must demonstrate that McCall's representation "fell below an objective standard of reasonableness." <u>Id.</u> at 687-88. *See also* <u>Murchu</u>, 926 F.2d at 58 (accord). Since there is a wide range of professionally competent representation, since there are an infinite number of situations in which counsel must make strategy decisions, and since defendants are often tempted to second-guess counsel's assistance after an adverse result, judicial scrutiny of trial counsel's performance "must be highly deferential" and "a court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Id.</u> at 689. *See also* <u>Matthews v. Rakiey</u>, 54 F.3d 908, 916 (1st Cir. 1995) (accord); <u>Ouber v. Guarino</u>, 158 F. Supp. 2d 135, 148 (D. Mass. 2001) (observing that habeas court "owes a high degree of deference to the judgment exercised and decisions made by counsel" and that habeas review "is not an occasion for judicial

9

second-guessing of informed judgments").

Applying the Strickland standard, the First Circuit has emphasized that "[t]he Constitution does not guarantee a defendant a letter-perfect defense or a successful defense; rather, the performance standard is that of reasonably effective assistance under the circumstances then obtaining." United States v. Natanel, 938 F.2d 302, 309-10 (1st Cir. 1991); Lema, 987 F.2d at 51 (accord); Arizaga v. United States, 130 F. Supp. 2d 335, 338 (D. P.R. 2001) (accord).

> Under *Strickland v. Washington*, ...counsel is not incompetent
> merely because he may not be perfect.  In real life, there is room
> not only for differences in judgment but even for mistakes,
> Which are almost inevitable in a trial setting, so long as their
> quality or quantity do not mark out counsel as incompetent.

Arroyo v. United States, 195 F.3d 54, 55 (1st Cir. 1999).  *See also* McGill, 11 F.3d at 227 ("To avoid the shoals of ineffective assistance, an attorney's judgment need not necessarily be right, so long as it is reasonable.")' Tavares v. United States, 230 F. Supp. 2d 126, 132 (D. Mass. 2001) (Bowler, MJ) (observing that the Sixth Amendment "guarantees proficient as opposed to perfect representation") (*citing* Prou,199 F.3d at 48.)

Like the Supreme Court, the First Circuit has emphasized that the performance standard "is to be applied not in hindsight, but based on what the lawyer knew, or should have known, at the time his tactical choices were made and implemented." Natanel, 938 F.2d at 309.  *See also* Lema, 987 F.2d at 51 (observing that habeas court must evaluate the challenged conduct "from counsel's perspective at the time" and must make every effort "to eliminate the distorting effects of hindsight"); Matthews, 54 F.3d at 917 (that counsel's trial strategy "was not ultimately a winning strategy is of no moment in assessing its reasonableness of [the] case, viewed as of the

time of counsel's conduct, counsel's performance was reasonable").

> [T]actical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance... Only where a defense decision is completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy, is further review into counsel's competence required.

United States v. Ortiz Oliveras, 717 F.2d 1, 3-4 (1st Cir. 1983). *See also* Barrett, 965 F.2d at 1193 (habeas petitioner must demonstrate that counsel's error "clearly resulted from neglect or ignorance rather than from informed, professional judgment" and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

Under the second prong of the Strickland test, Franco must affirmatively prove prejudice, i.e., that his attorney's errors "actually had an adverse effect on the defense" and not merely that they "had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693.

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Strickland, 466 U.S. at 694. *See also* Matthews, 54 F.3d at 916 (accord). Focusing on this prong, the First Circuit has stated:

> On one end, it is not enough to show that the errors had "some conceivable effect on the outcome." Nor is it required, however, that the defendant prove that the errors made were more likely than not to have affected the verdict. It is important to maintain the focus of an ineffectiveness inquiry on the "fundamental fairness of the proceeding."

Gonzalez-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001).

Attorney McCall was not constitutionally ineffective on the "safety valve" issue.

Franco argues that McCall's representation was constitutionally ineffective because he failed to request an evidentiary hearing on the disputed "safety valve" issue.  In order to qualify for a "safety valve" reduction under U.S.S.G. § 2D1.1(b)(7), a defendant must meet criteria 1-5 of U.S.S.G. §5C1.2.  It was disputed whether Franco satisfied criterion 5, which requires that:

> not later than the time of the sentencing hearing, the defendant
> has truthfully provided to the Government all information and evidence
> the defendant has concerning the offense or offenses that were part of
> the same course of conduct or of a common scheme or plan...

U.S.S.G § 5C1.2(a)(5).  The First Circuit has emphasized the necessity of a defendant's fulfilling all five criteria, including the provision of truthful and complete information to the government, in order to qualify for "safety valve relief."  United States v. Scharon, 187 F.3d 17, 22 (1st Cir. 1999); *see also* United States v. McLean, 409 F.3d 492, 505 (1st Cir. 2005) (affirming district court denial of safety valve because constructive possession of a firearm violated criterion 2).  Moreover, the First Circuit has expressly stated that "as to [the fifth]  requirement, we have made it pellucid that nothing short of truthful and complete disclosure will suffice (and, therefore, that truthful and complete disclosure is a condition precedent to relief under the safety valve)." United States v. Matos, 328 F.3d 34, 38 -39 (1st Cir. 2003); *see also* United States v. Richardson, 225 F.3d 46, 53 (1st Cir. 2000) (affirming district court's denial of safety valve because defendant failed to divulge all information he possessed concerning a crime).

Attorney McCall specifically addressed the truthfulness of Franco's proffer, or his satisfaction of criterion 5, both in the sentencing memorandum that he filed and during the sentencing hearing.  In the sentencing memorandum, McCall argued that the Court should find that Franco's truthful proffer qualified him for criterion 5,  making him eligible for the "safety valve" reduction.  [DSM 3].  In particular, McCall attacked co-defendant Pena's proffer that

portrayed Franco as the mastermind of the conspiracy and Pena himself as a mere worker, calling the government's evidence "conclusory and self-serving" and emphasizing Pena's role as the initial contact person in the transaction with Ford.  McCall reiterated the same points at the sentencing hearing, arguing to the Court that Franco and Pena "truly act[ed] in tandem as joint venturers," as proffered by Franco. [ST 4].

McCall's decision not to request an evidentiary hearing on the "safety valve" issue was not ineffective in light of the totality of the circumstances, which included the weight of the government's evidence and the requirement that a sentencing court must assess the likely utility arising out of such a hearing.  It bears emphasis at this juncture that the facts as to what Franco and Pena had stated at their respective proffers was undisputed and known to the Court. Moreover, even if McCall requested an evidentiary hearing, the Court was under no obligation at all to give him one.  Given the totality of the record evidence, there was no need for the Court to conduct such a hearing in this case.

In its sentencing memorandum, the government raised several inconsistencies between Franco's and Pena's proffers, as well as between Franco's proffer and the other evidence discovered during the investigation, such as who was the true leader in the conspiracy, the dates of sales, and the amount of drugs involved in the conspiracy.  [GSM: 7-9].  McCall's decision not to request an evidentiary hearing was not constitutionally ineffective in light of these inconsistencies because it was not likely that such a hearing would have been helpful to Franco and indeed, it might have been harmful had the Court found Franco not to be credible.  As McCall well knew, Franco ran the risk of receiving a role-in-the-offense enhancement had the Court credited Pena's anticipated testimony that Franco played a supervisory role in the drug

13

conspiracy.  Such tactical decisions, weighing the benefits versus the risks, are peculiarly within

the lawyer's realm and should not be second-guessed at this point.  Therefore, the Court should

deny Franco's petition on the ground that McCall properly made a strategic decision not to seek

an evidentiary hearing.

> <u>Attorney McCall was not constitutionally ineffective in not seeking a downward
> departure based on extraordinary family circumstances.</u>

Section 5H1.6 of the Sentencing Guidelines states that "[f]amily ties and responsibilities

and community ties are not ordinarily relevant in determining whether a sentence should be

outside the applicable guideline range."  Section 5K2.0 provides that under U.S.C. § 3553(b), a

sentencing court may depart from the Guidelines range if  "there exists an aggravating or

mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the

Sentencing Commission in formulating the guidelines that should result in a sentence different

from that described."  To warrant a departure from the guideline range, a circumstance must

"render the case atypical and take it out of the 'heartland' for which the applicable guideline was

designed." <u>United States v. Roselli</u>, 366 F.3d 58, 68 (1st Cir. 2004), *quoting* <u>United States v.
Carrion-Cruz</u>, 92 F.3d 5, 6 (1st Cir. 1996).  Family circumstances are generally considered a

"discouraged" ground for such a departure from which a district court may only depart in an

"exceptional" case.  <u>United States v. Louis</u>, 300 F.3d 78, 81-82 (1st Cir. 2002); *see also* <u>Koon v.
United States</u>, 518 U.S. 81, 82 (1996) (observing that if a special factor that takes a case outside

the Guidelines' "heartland" is also a discouraged factor, "the court should depart only if the

factor is present to an exceptional degree or in some other way makes the case different from the

ordinary case where the factor is present").

The First Circuit has affirmed departures for exceptional family circumstances only on

rare occasions, when a defendant was so irreplaceable that incarceration would cause exceptional

hardship to his family.  Rosselli, 366 F.3d at 68.  In order to determine whether this limited

circumstance exists, the district court must inquire as to whether there are "*feasible* alternatives

of care that are relatively comparable to what the defendant provides." United States v. Pereira,

272 F.3d 76, 82 (1st Cir. 2001); *see also* United States v. Sclamo, 997 F.2d 970, 974 (1st Cir.

1993) (affirming a departure where the defendant's stepson made dramatic progress from a

psychiatric disorder, largely due to defendant's support and care); United States v. Rivera, 994

F.2d 942, 952-54 (1st Cir. 1993) (allowing a departure where the defendant was a single mother

of three children, received income only from welfare, and had virtually no contact with or

support from other family members).

The First Circuit has struck down departures in cases with familial circumstances more

extraordinary than that of Franco or where the defendant was more irreplaceable to his family

than Franco. See United States v. Claudio, 44 F.3d 10, 16 (1st Cir. 1995) (affirming district

court's refusal to schedule live medical testimony and relying on proffer to deny downward

departure based on defendant's asserted need to care for 12-year old son suffering from

neurological condition and learning disorder); United States v. Romero, 32 F.3d 641, 652-54 (1st

Cir. 1994) (district court did not grant downward departure to Colombian defendant whose wife

was murdered, whose three children were living with a sister who could not afford to support

them and whose son had a rare blood disease, stating facts of case where not so different from

most cases); United States v. Chestna, 962 F.2d 103, 107 (1st Cir. 1992) (finding that a

defendant who was the single mother of four young children was not an exceptional family

hardship that warranted a departure from the guidelines because "single mother status is not an

idiosyncratic circumstance..."); United States v. Rushby, 936 F.2d 41, 42-43 (1st Cir. 1991)

(drug defendant's steady employment for ten years, his status as the main breadwinner for wife

and two children, and his aid to his wife's grandmother "are simply not sufficient to invoke the

exceptions implied by the word 'ordinary' in §5H1.6"); United States v. Carr, 932 F.2d 67, 72-

73 (1st Cir. 1991) (reversing a departure where defendant and her husband both faced prison

terms because defendant's mother could take care of their young child).

In his § 2255 motion, Franco claims that McCall was ineffective for not having sought a

downward departure due to his "extraordinary" family circumstances because he is the *exclusive*

provider for his infant son and for his elderly ill parents.  However, the PSR contradicts these

conclusory claims and states that Franco's infant son resides in the Dominican Republic with his

mother, who is Franco's girlfriend; that Franco's parents and four of his siblings also reside in

the Dominican Republic; and that the entire family is supportive of Franco.  [PSR ¶¶ 41-42, 44-

48, 53-58A).[6]  There is nothing in the PSR suggesting that Franco's parents, who were 62 and 67

years old at the time of sentencing, were ill.  Thus, it appears that McCall had good reason not to

raise such a meritless issue.

Even assuming the credibility of Franco's assertions, Franco has alleged nothing more

than that which innumerable defendants could easily establish: "the disintegration of existing

family life or relationships [that] is to be expected when a family member engages in criminal

activity that results in a period of incarceration." United States v. Kapitzke, 130 F.3d 820, 822

(8th Cir. 1997), *quoting* United States v. Canoy, 38 F.3d 893, 907 (7th Cir. 1994).  In sum,

---

[6]Interestingly, Franco states nothing about the two minor children who reside in Boston with their mother, to whom Franco is still married although separated.  [PSR ¶ 52].

Franco has not established "family circumstances so exceptional that they constitute the rare case justifying a departure from the guidelines which already recognize the reality of difficult family circumstances for many defendants and which discourage making an additional allowance on that basis." United States v. Archuleta, 128 F.3d 1446, 1450 (10th Cir. 1997).

In short, McCall acted appropriately in not requesting a downward departure on this ground, given the extremely narrow situations in which the Court of Appeals has sanctioned downward departures for extraordinary family circumstances. Given that there are "feasible alternatives" to Franco's financial support, such as his girlfriend providing for their son and his siblings providing for their parents, the Court should give deference to McCall's decision not to request a departure under these circumstances.

Franco Was Not Prejudiced by McCall's Performance

Even assuming *arguendo* that Attorney McCall was ineffective, his performance did not prejudice Franco. As a result of McCall's efforts, Franco was not given a role enhancement and was sentenced at the low end of the GSR under the mandatory guideline system in effect at the time. Franco has failed to meet the burden of demonstrating that McCall's performance undermined the fairness or integrity of that result. Franco's own failure to meet criterion 5 of the safety valve, by not fully and truthfully disclosing information to the government, precluded any attempt by McCall to request an evidentiary hearing that would have benefitted Franco. Moreover, because courts grant downward departures for extraordinary family circumstances only in rare situations, it would have been virtually impossible for McCall to obtain a downward departure, given that Franco's familial circumstances belong in the "'heartland' of cases under the Guidelines" for which departure is inappropriate. *See* Louis, 300 F.3d at 82, *quoting* United

States v. Bogdan, 284 F.3d 324, 330 (1st Cir. 2002).

II.     **Franco's Claim That Court Failed To Conduct An Evidentiary Hearing Sua Sponte on Safety Valve Is Foreclosed Because It Was Decided On Direct Appeal**

Franco's claim that this Court erred in not conducting *sua sponte* an evidentiary hearing on the "safety valve" issue is not cognizable in this proceeding because this issue was resolved against him in his direct appeal to the First Circuit.  It is firmly settled in the First Circuit that issues disposed of on a prior appeal will not be reviewed again by a motion to vacate sentence. United States v. Dirring, 370 F.3d 862, 864 (1st Cir. 1967); *see also* United States v. Argencourt, 78 F.3d 14, 16 n.1 (1st Cir. 1996) (determining that defendant was not free to relitigate an argument concerning the examination of a special agent in his § 2255 motion because it was decided against him on direct appeal); United States v.Singleton, 26 F.3d 233, 239-40 (1st Cir. 1994) (holding that defendant's argument for postconviction relief from his sentence fails because a substantially similar argument was rejected on direct appeal); United States v. Michaud, 901 F.2d 5, 6 (1st Cir. 1990) (noting that claims decided on direct appeal may not be relitigated under a different label on collateral review); United States v. Tracey, 739 F.2d 679, 682 (1st Cir. 1984) (rejecting petitioner's claims that his presentence report contained false, erroneous, and prejudicial material because the claims were previously considered and rejected on appeal).

Other circuits concur that claims raised and decided on appeal cannot be relitigated in a subsequent § 2255 motion. *See* United States v. Davis, 406 F.3d 505, 511 (8th Cir. 2005); United States v. Perez, 129 F.3d 255, 260 (2d Cir. 1997); Kramer v. United States, 788 F.2d 1229 (7th Cir. 1986).  Moreover, the Supreme Court has ruled that "even though the legal issue raised in a prior direct appeal from petitioner's conviction was determined against petitioner, he is not

18

precluded from raising the issue in a § 2255 proceeding 'if new law has been made . . . since the trial and appeal.'" <u>Davis v. United States</u>, 417 U.S. 333 (1974), *quoting* <u>Kaufman v. United States</u>, 394 U.S. 217, 230 (1969); *compare* <u>Wright v. United States</u>, 182 F.3d 458, 467 (6th Cir. 1999) ("absent exceptional circumstances, or an intervening change in the case law, [a petitioner]  may not use his § 2255 petition to relitigate [an] issue").

Franco may not relitigate this issue because the issue was raised and decided on appeal to the First Circuit.  In his direct appeal, Franco claimed that this Court committed clear error in relying on the findings of the PSR and in failing to make independent factual findings on the sufficiency of Franco's proffer after conducting an evidentiary hearing.  The First Circuit directly addressed this issue, finding "no clear or plain error" in the sentence imposed by this Court, therefore affirming this Court's decision not to apply the "safety valve" provisions or to conduct an evidentiary hearing.  Because the issue has been decided on appeal and because there are no exceptional circumstances or changes in law present in this case, Franco is barred from raising the issue again in his § 2255 motion.

**III    Franco's Claim That His Sentence Was Based On Prosecutorial Vindictiveness Is Not Supported By Any Facts And Is Refuted By The Record.**

The Sentencing Guidelines are designed to punish co-defendants differently, based on their respective roles in the crime, as well as their respective criminal histories, and do not require the sentencing court to consider related cases or to justify a sentence in terms of the punishment meted out to co-defendants.  <u>United States v. Font-Ramirez</u>, 944 F.2d 42, 50 (1st Cir. 1991).  Accordingly, the purpose of the guidelines, to achieve uniformity in sentencing, applies only to "*similar criminal conduct by similar offenders*" and not where co-defendants played different roles in the offense.  *See* <u>United States v. Trujillo</u>, 906 F.2d 1456, 1465 (10th Cir.

1990), *quoting* U.S.S.G. intro. p. 1.2. (arguing that a co-defendant with a six-level reduction was not "similarly situated" to co-defendant and therefore, the district court was not required to give them the same sentences).

The First Circuit has consistently rejected departures from the guideline range solely in an effort to achieve uniform sentences between co-defendants. *See* <u>United States v. Wogan</u>, 938 F.2d 1446, 1448 (1st Cir. 1991); *see also* <u>United States v. Nelson-Rodriguez</u>, 319 F.3d 12, 59 - 60 (1st Cir. 2003) ( "A court cannot depart from the sentencing guidelines in order to correct a disparity between the sentences of coconspirators"); <u>United States v. Ortiz-Santiago</u>, 211 F.3d 146, 150 (1st Cir.2000) ("Disparity in sentencing amongst coconspirators, without more, is not enough to justify a downward departure"); <u>United States v. Flores</u>, 230 F. Supp. 2d 138, 141 n. 5 (D. Ma. 2002) ("The guidelines do not permit a departure from guidelines sentences merely for the purpose of redressing disparate sentences as between co-defendants in a single case").

Franco's contention that he received a more severe sentence than Pena because the prosecutor had a personal vendetta against him due to his failure to appear at the Rule 11 hearing was not raised in his direct appeal and therefore must be deemed waived by reason of procedural default.  Even if the argument was not waived, it has no factual support whatsoever.  Franco does not, and cannot, point to any statement or action of government counsel that would demonstrate a personal vendetta against Franco.  Government counsel never sought to charge Franco for his unexcused absence at the Rule 11 hearing or for his destruction of the government's electronic monitoring bracelet.  Government counsel never said anything that would indicate a personal bias against Franco.  In short, Franco is grasping at straws when he asserts this claim and the Court should give it short shrift.

20

It is obvious from the record that the disparity in sentences between Franco and Pena resulted from the normal application of the Sentencing Guidelines and not from any vindictiveness on the part of the government.  Both defendants started out at BOL 26 based on the same drug weight for which both were held accountable.  However, the similarities ended there.  Franco received a two-level obstruction-of-justice increase because he defaulted at his Rule 11 hearing; Pena did not receive any such enhancement.  Pena received a two-level "safety valve" reduction; Franco did not.  Pena received a three-level acceptance-of-responsibility reduction; Franco did not.  Thus, while Franco's TOL was 28, Pena's TOL was 21.   While Franco's GSR was 78-97 months, Pena's GSR was 37-46 months.

Even more important, the Court found that Pena suffered from "severe esophageal varices," a rare and highly dangerous physical condition which Pena suffered since childhood and which could lead to excessive internal bleeding if Pena was incarcerated.  *See* Transcript of July 10, 2002 Sentencing Hearing at 4.  The Court stated that, but for this condition, it would have imposed a sentence of 37 months' imprisonment (the low end of the applicable GSR) but that a downward departure was appropriate due to the "truly extraordinary circumstances of this case." Id. at 4-7.  The government opposed the downward departure. Id. at 7-8.  At a second sentencing hearing, the Court followed through on its stated intention to depart downward and imposed a sentence of one year and one day, with a judicial recommendation that Pena serve this sentence at FMC Devens "to enable him to continue to receive treatment as needed at Massachusetts General Hospital" and that Pena not report "until I have been assured that [FMC] Devens is ready to take him at that time."   *See* Transcript of July 25, 2002 Sentencing Hearing at 5-8.  The Court reiterated that Pena's medical condition was "central" to the sentence it

21

imposed.  Id. at 8.

It is clear from the above record materials that the lesser sentence received by Pena

resulted from (1) the normal application of the Sentencing Guidelines resulting in a lower GSR

for Pena and (2) the Court's decision, which was opposed by the government, to depart

downward based on Pena's atypical physical condition.  Given these undisputed facts, and the

complete lack of any facts to support Franco's assertion that government counsel was somehow

vindictive, this claim must be denied.

## Conclusion

For the above reasons, the government respectfully requests that the Court dismiss

Franco's

§ 2255 motion without an evidentiary hearing.

                                        Respectfully submitted,
                                        MICHAEL J. SULLIVAN
                                        United States Attorney

                            By:     /s/Michael J. Pelgro
                                        Michael J. Pelgro
                                        Assistant U.S. Attorney

DATED:        August 20, 2005.

CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery:

> Narciso A. Franco
>
> Inmate No. 23787-038
>
> FSL Elkton, Unit H/A
>
> P.O. Box 10
>
> Lisbon, OH 44432

This 20th day of August 2005.

/s/Michael J. Pelgro
MICHAEL J. PELGRO
ASSISTANT UNITED STATES ATTORNEY